UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

UNITED STATES OF AMERICA

    Plaintiff,

v.

EUGENE PAUL LOONSFOOT, SR.,

    Defendant.
_____/

Case No. 2:20-cr-00027

Hon. Janet T. Neff
U.S. District Judge

## REPORT AND RECOMMENDATION

### I. Introduction

This Report and Recommendation addresses Defendant's motion to suppress his January 24, 2019, statement to FBI Special Agent (SA) Hoff and Keweenaw Bay Tribal Police Sergeant (Sgt.) Goodreau. (ECF No. 71.) The undersigned conducted an evidentiary hearing on July 26, 2021. SA Hoff testified via Zoom during the hearing. Defendant's motion is fully briefed. (*See* ECF Nos. 87 (Government's response), 89 (Government's supplemental brief), 90 (Defendant's supplemental brief).)

On October 14, 2020, a federal grand jury returned an indictment charging Eugene Paul Loonsfoot, Sr. with one count of Aggravated Sexual Abuse of a Child under 12 years, in violation of 18 U.S.C. §§2241(c), 2246(2)(B), 1151, and 1153. (ECF No. 1.) The single count in the indictment alleges that Loonsfoot caused contact between his penis and the victim's mouth, at some time between September 2004 and

September 2006.  (*Id.*)  The indictment identifies the victim as "S.L.D., an Indian female, who had not yet attained the age of twelve years."

As an initial matter, it is important to note that Loonsfoot's statements during the interview cannot be classified as clear, unambiguous confessions.  Instead, his statements include outright denials of misconduct such as "I have no idea what you're talking about" (*see*, *e.g.*, Gov't Exh. 1 hereafter ("Recording" at 19:15), and "well, I haven't done anything" (Recording at 26:15).  Additionally, he expressed anger resulting from the officers' accusations (Recording at 24:40) and acknowledged that he drank to the point of blacking-out and that some acts of a sexual nature might have been possible when he was drunk (Recording at 31:00 to 32:30).  In general, Loonsfoot's statements evolved over the course of the interview from clear denials to some acknowledgement of wrongdoing.  But, he never admitted a long-running sexual relationship with the victim.  The statement that appears to be most incriminating to Loonsfoot is his admission that he may have caressed the victim's "private parts" when she was five or six years old.  (Recording at 34:25.[1])

---

[1]  Loonsfoot is not charged with caressing the victim's private parts.  Indeed, during the evidentiary hearing, the parties agreed that this statement is based upon a different act of sexual abuse than the indicted act.
  The undersigned notes that Loonsfoot's statement regarding contact with the victim's private parts may be barred by Rule 404(a) of the Federal Rules of Evidence, which prohibits introduction of a person's character or character trait to prove that, on a particular occasion, the person acted in accordance with the character or trait.  In other words, propensity evidence is not allowed.  Rules 404(b), 413 and 414, however, provide some exceptions to this rule.  Although this particular admission does not directly implicate Loonsfoot in the indicted criminal conduct, it may be admissible under one of these rules.

In his motion to suppress and supplemental briefing, Loonsfoot argues that his statements to SA Hoff and Sgt. Goodreau during an hourlong interview should be suppressed for two main reasons. He asserts, first, that he was interrogated by Hoff and Goodreau while in their custody without being advised of his *Miranda* rights. Second, Loonsfoot asserts that his responses to questions posed by Hoff and Goodreau were the product of police coercion, deception, and duress, and accordingly were involuntary. Loonsfoot specifically states that it was improper for SA Hoff to insist that Loonsfoot admit his guilt, after Loonsfoot had indicated that he could not specifically recall events due to his intoxication.

The Government disagrees with both of Loonsfoot's arguments.

Regarding the first issue – whether Loonsfoot was subject to custodial interrogation necessitating *Miranda* warnings – the undersigned concludes that he was not subject to restrictions that would have led a reasonable person to conclude that he was under arrest or the functional equivalent of arrest. Accordingly, the interviewing officers were not required to advise Loonsfoot of his *Miranda* rights and their failure to do so does not necessitate the suppression of the interview. In addition, the undersigned concludes that the evidence shows that Loonsfoot's statements to police were not coerced. Accordingly, the undersigned respectfully recommends that the Court deny Defendant's motion to suppress.

## II. Summary of Testimony and Evidence

FBI SA Hoff was the only witness to testify during the evidentiary hearing. The government presented a recording of the interview [2] (Gov't. Exh. 1.) and photographs showing the exterior of the building where the interview took place (Gov't. Exhs. 2, 3.)

SA Hoff testified that, in January of 2019, he learned from Keweenaw Bay Indian Community (KBIC) Social Services that a young woman claimed that she had been sexually abused as a child. Loonsfoot was identified as the individual who may have had sexual contact with the victim.

Hoff testified that, on January 24, 2019, he and Sgt. Goodreau went to Loonsfoot's home and asked him if he would be willing to answer questions at a private location. Loonsfoot agreed. Sgt. Goodreau drove Loonsfoot and SA Hoff to the KBIC Social Services Building. During the drive, Loonsfoot sat in the front passenger seat of the patrol car while SA Hoff sat behind him in the rear of the vehicle. Sgt. Goodreau was dressed in his KBIC police uniform with his firearm visible, and SA Hoff was plain-clothed, wearing a winter coat, with his firearm concealed. After arriving at the KBIC Social Services Building, SA Hoff introduced himself to Loonsfoot and started a conversation with Loonsfoot about his past military career. Loonsfoot was taken into the building and directed to the child

---

[2] Defendant provided a transcript of the recorded interview. (Defendant's Exh. A.) The transcript was admitted over the government's objection for use during the suppression hearing to assist in following along with the recorded interview. As noted on the record, the Court will rely on the recording as the most accurate copy of the statements made during the interview.

forensic interview room, which was described as a small office, approximately 12 feet by 12 feet, with a few chairs, and a bookshelf.

Hoff testified that Loonsfoot was told that he was free to leave and that he did not have to answer any questions. Loonsfoot was placed in the seat closest to the door. Loonsfoot was not handcuffed.

During the hearing, the Government played the entire recording of the interview, which lasted more than an hour. The recording indicates that SA Hoff discussed Loonsfoot's military career as a U.S. Marine (Recording at 2:20 to 3:50; 4:50 to 5:40), before changing to questions about Loonsfoot's grandchildren and whether they were honest (Recording at 8:40 to 13:30).

The recording also demonstrates that SA Hoff attempted to have Loonsfoot sign some type of FBI document, but Loonsfoot refused to sign. (Recording at 16:00 to 17:00). Hoff testified that this form was likely an FBI Section 1001 form, which is used as a way for interviewees to acknowledge that they understand that making a false statement to an FBI agent is a felony offense.

On the recording, SA Hoff informed Loonsfoot that it was important to tell the truth. SA Hoff then stated that Loonsfoot's wife had informed them about the sexual assault of their grandchild. (Recording at 17:28 to 18:00.) SA Hoff acknowledged at the hearing that this was not true, but he did not want to disclose that the information had come from the victim due to his concern for her protection.

On the recording, SA Hoff can be heard informing Loonsfoot that his situation would go "smoother" if he told the officers what happened. (Recording at 28:21.) In

5

addition, they told Loonsfoot that it would be better for him if he told them what happened.

On the recording, Loonsfoot denied sexual penetration and initially denied engaging in any sexual act with his grandchildren. (Recording at 19:15, 26:15, 29:30, 30:18.) Sgt. Goodreau and SA Hoff told Loonsfoot that they knew that Loonsfoot was not telling them everything and that there was no doubt in their minds that Loonsfoot had engaged in sexual acts with his granddaughter. The officers were not specific about what the acts were or when they happened.

Sgt. Goodreau also suggested that Loonsfoot might have been drunk, maybe even blacked-out during the assault. (Recording at 31:00 to 32:44.) Loonsfoot agreed that this was possible, but stated that he did not remember. Toward the end of the interview, Loonsfoot admitted that he thought "maybe" he had "caressed" the victim's private parts when she was five or six years old. (Recording at 34:25.)

After the interview concluded, Goodreau and Hoff drove Loonsfoot back to his residence. Loonsfoot was not arrested.

### III. Analysis

#### 1. Possible *Miranda* Violation

It is undisputed that Loonsfoot was not advised of his *Miranda* rights. Loonsfoot argues that the circumstances surrounding his interview with Goodreau and Hoff indicate that the restraint on his freedom of movement was of the type typically associated with formal arrest. Thus, Loonsfoot asserts that he was subjected to a custodial police interrogation *without* being advised of his *Miranda*

rights and, as a result, that the statements he made during the interview should be suppressed. The government argues that Loonsfoot was not in custody at the time he made his statements, thus *Miranda* warnings were not required.

The undersigned begins this analysis with the fundamental principles of *Miranda*.

> The Fifth Amendment provides that a defendant cannot be "compelled in any criminal case to be a witness against himself." Consistent with this right against self incrimination, the Supreme Court's decision in *Miranda v. Arizona*, 384 U.S. 436, 478-479, 86 S.Ct. 1602, 1630, 16 L.Ed.2d 694 (1966), ruled that suspects cannot be subjected to a custodial interrogation until they have been advised of their rights. In order to encourage compliance with this rule, incriminating statements elicited from suspects in custody cannot be admitted at trial unless the suspect was first advised of his or her Miranda rights. *Stansbury v. California*, 511 U.S. 318, 322, 114 S.Ct. 1526, 1528-29, 128 L.Ed.2d 293 (1994).

*United States v. Salvo*, 133 F.3d 943, 948 (6th Cir. 1998). Thus, law enforcement's obligation to administer *Miranda* warnings is triggered only where there has been such a restriction on a person's freedom as to render him "in custody." *Miranda*, 384 U.S. at 444.

In determining whether an individual is in custody, a court must examine the totality of the circumstances surrounding the interrogation, but the ultimate inquiry is simply whether there was a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest. *Stansbury*, 511 U.S. at 322. "As used in [the Supreme Court's] *Miranda* case law, 'custody' is a term of art that specifies circumstances that are thought generally to present a serious danger of coercion." *Howes v. Fields*, 565 U.S. 499, 508–09 (2012). And "[i]n determining whether a

person is in custody in this sense, the initial step is to ascertain whether, in light of 'the objective circumstances of the interrogation,' a 'reasonable person [would] have felt he or she was not at liberty to terminate the interrogation and leave.'" *Id.* at 509 (quoting *Stansbury,* 511 U.S. at 322–323, and *Thompson v. Keohane,* 516 U.S. 99, 112 (1995)). Under this approach, courts look at factors that include: (1) the purpose of the questioning; (2) whether the place of the questioning was hostile or coercive; (3) the length of the questioning; and (4) other indicia of custody such as whether the suspect was informed at the time that the questioning was voluntary or that the suspect was free to leave or to request the officers to do so; whether the suspect possessed unrestrained freedom of movement during questioning; and whether the suspect initiated contact with the police or voluntarily acquiesced to the request for an interview. *Salvo,* 133 F.3d at 950.

Two Supreme Court cases deal with facts that closely resemble those presently in Loonsfoot's case. In *California v. Beheler*, 463 U.S. 1121, the suspect voluntarily accompanied police to the station for questioning and freely departed at the end of the interview, after being told he was not under arrest but that his statement would be evaluated by the district attorney concerning that possibility. Similarly, in *Oregon v. Mathiason*, 429 U.S. 492 (1977), the defendant agreed to meet the investigating officer at the station house for an interview. The defendant was told he was a burglary suspect but that he was not under arrest. He was told that his truthfulness would be evaluated by the district attorney or judge. He was taken into a closed office, where he was questioned concerning the burglary. The defendant

8

was falsely told that his fingerprints were found at the scene. After a long pause, the defendant admitted to the crime. The defendant was then given *Miranda* warnings, but was not arrested. He left the station after being informed that the case would be referred to the district attorney for a decision whether charges would be pursued.

In these cases, the Supreme Court found that *Miranda* warnings were unnecessary because questioning did not take place in a context in which the defendant's freedom to depart was restricted in a meaningful way. The Court acknowledged that all police interviews of those suspected of crime have coercive aspects. However, police are not required to administer *Miranda* warnings to every suspect they interview. It is only under the additional pressures of a custodial environment that *Miranda* is triggered.

In the opinion of the undersigned, the objective evidence shows that a reasonable person in Loonsfoot's position would not have felt that he or she was subject to a restraint on his or her freedom of movement to a degree associated with a formal arrest. Loonsfoot was asked to participate in an interview and he agreed. He was then driven to a private location – the Tribal Social Services building – for questioning. When they arrived at the building, SA Hoff introduced himself and they entered a child interview room that contained two chairs and a couch. Loonsfoot sat in the chair closest to the door. SA Hoff advised Loonsfoot that he was not under arrest, that he did not have to speak with them, and that he was free to leave at any time. Loonsfoot was not handcuffed. After closing the door to the

9

interview room, SA Hoff told Loonsfoot he was free to leave and that he had closed the door for privacy. The entire interview lasted approximately one hour. When the interview was complete, the officers drove Loonsfoot back to his residence. As in *Beheler* and *Mathiason*, Loonsfoot's freedom to leave was not restricted in a way that was the functional equivalent of arrest.

In summary, in the opinion of the undersigned, Loonsfoot was not subject to restrictions that would have led a reasonable person to conclude that he was under arrest or the functional equivalent of arrest. Accordingly, the interviewing officers were not required to advise Loonsfoot of his *Miranda* rights and their failure to do so does not necessitate the suppression of the interview.

   2. **Coercion**

Loonsfoot's primary focus in this motion has been on the alleged coerciveness of the interviewing technique (known as the Reid interviewing technique[3]) that was applied, or misapplied, by SA Hoff and Sgt. Goodreau. Loonsfoot points to a number

---

[3]   Developed by John Reid, the Reid technique is described as follows:

> First, investigators are advised to isolate the suspect in a small private room, which increases his or her anxiety and incentive to escape. A nine-step process then ensues in which an interrogator employs both negative and positive incentives. On one hand, the interrogator confronts the suspect with accusations of guilt, assertions that may be bolstered by evidence, real or manufactured, and refuses to accept alibis and denials. On the other hand, the interrogator offers sympathy and moral justification, introducing "themes" that minimize the crime and lead suspects to see confession as an expedient means of escape.

*United States v. Deuman*, 892 F. Supp. 2d 881, 889 (W.D. Mich. 2012).

of different aspects of the interview that indicate that the interview technique was unfairly coercive. Loonsfoot asserts, first, that FBI SA Hoff misapplied the Reid technique by asking about his military service in the Marine Corps, and by talking casually about his nickname and his employment history. In essence, Loonsfoot argues that the officers were attempting to build a false rapport with Loonsfoot in order to get him to confide in them. In addition, Loonsfoot complains that the officers asked about his granddaughter's truthfulness, and he eventually rated her truthfulness as a 10 on a scale from 1 to 10. (Recording at 12:16 to 13:30.) Loonsfoot asserts that although SA Hoff told him it was important to be honest, SA Hoff was not honest with Loonsfoot when he indicated they knew he "did this" and by claiming, falsely, that they had spoken with Loonsfoot's wife. Loonsfoot says that when he denied molesting his granddaughter, SA Hoff responded by misusing Reid interrogation methods by insisting on a confession of guilt, stating "you know that's true, and I know that's true." (Recording at 19:20.) SA Hoff further stated that Loonsfoot would fail a polygraph test. Loonsfoot notes that SA Hoff also said that he was not trying to "blame" him. (Recording at 24:46.) SA Hoff brought up the victim's suicide attempt and stated that Loonsfoot knew that his molestation was a contributing factor. (Recording at 26:54 to 27:29.) SA Hoff then more forcefully confronted Loonsfoot and told him he was absolutely, 100 percent sure Loonsfoot did this. (Recording at 30:27.) Then Sgt. Goodreau suggested that Loonsfoot may have been drinking when he did "[t]his kind of stuff." (Recording at 31:00 to 32:44.) At this point Loonsfoot admitted that "maybe [he] was hugging her . . . caressing her"

and "feeling her private parts" but he never penetrated her. (Recording at 33:49 to 35:39.)

Loonsfoot argues that this line of questioning was improperly coercive and caused him to make his admissions under duress.

Ultimately, the Court must decide whether the defendant's will was overborne at the time of his confession. *Ledbetter v. Edwards,* 35 F.3d 1062, 1070 (6th Cir. 1994). "To frame this analysis, the Sixth Circuit has set forth three factors for courts to consider: '(i) the police activity was objectively coercive; (ii) the coercion in question was sufficient to overbear the defendant's will; and (iii) the alleged police misconduct was the crucial motivating factor in the defendant's decision to offer the statement.'" *United States v. Rutherford*, 555 F.3d 190, 195 (6th Cir. 2009) (quoting *United States v. Mahan*, 190 F.3d 416, 422 (6th Cir. 1999)).

The Court is required to look at the totality of the circumstances to determine if the investigating officers engaged in coercive conduct during the interrogation and whether the coercive conduct resulted in the incriminating statements. *Colorado v. Connelly*, 479 U.S. 157 (1986). As the Sixth Circuit explained: "[w]hether an interrogation rises to the level of coercion turns on a spectrum of factors: the age, education and intelligence of the suspect; whether the suspect was advised of his *Miranda* rights; the length of the questioning; and the use of physical punishment or the deprivation of food, sleep or other creature comforts." *Jackson v. McKee*, 525 F.3d 430, 433–34 (6th Cir. 2008) (citing *Schneckloth v. Bustamonte,* 412 U.S. 218, 226 (1973)).

In *Connelly*, the court rejected the argument that a defendant's mental state without police coercion was enough to suppress a confession as involuntary. In that case, the defendant suffered from chronic schizophrenia. The voice of God told defendant to confess to the murder. Defendant contacted police and confessed to the murder. The Supreme Court rejected the contention that defendant's mental state alone rendered the confession involuntary. "But this fact does not justify a conclusion that a defendant's mental condition, by itself and apart from its relation to official coercion, should ever dispose of the inquiry into constitutional 'voluntariness.'" *Id*. at 164.

The government has the burden to establish that Loonsfoot's will was not overborn by coercive interrogation tactics. Looking at the first factor – whether the police activity was objectively coercive – the undersigned concludes that it was not. As previously explained, with respect to the objective evidence of custody, Loonsfoot was told that he was free to leave and that he did not have to answer any questions. Loonsfoot agreed to go to the Tribal building for the interview. The interview lasted approximately one hour and Loonsfoot was not handcuffed or placed under stress through deprivation of food, water, or sleep.

Several other aspects of the interview also do not indicate coercion. First, Loonsfoot argues that the SA Hoff promised leniency when Loonsfoot was told it would be better for him to tell the truth. As noted above, Hoff told Loonsfoot that his situation would go smoother and that it would be better for him if he Hoff and Goodreau about his sexual contacts with the victim. (Recording at 28:00 to 28:30.)

Promises of leniency that are not broken or illusory do not make a confession involuntary. *United States v. Binford*, 818 F.3d 261, 266, 271-72 (6th Cir. 2016) (statement "you help me, I help you" was not coercive). Similarly, questions based upon other evidence of guilt are not coercive. *United States v. Sablotny*, 21 F.3d 747, 752-53 (7th Cir. 1994) ("But the police are allowed to play on a suspect's ignorance, fears and anxieties so long as they do not magnify these emotionally charged matters to the point where a rational decision becomes impossible."). Hoff's statement hinted at leniency without making specific promises. But, more importantly, Loonsfoot was not charged with the act of sexual contact to which he confessed. Thus, the undersigned cannot say that Hoff made or broke any promise.

Second, an agent's use of "small talk" before asking about criminal activity was not improper or coercive. *United States v. Gray,* 137 F.3d 765, 771 (4th Cir. 1998). Here, Hoff and Goodreau spoke to Loonsfoot about his time in the Marines and a bit of his work history. Undoubtedly, they were attempting to build a rapport with him. But the undersigned cannot say that this small talk led Loonsfoot to confess.

Third, questions based upon false or misleading statements are not coercive.[4] *Loza v. Mitchell*, 766 F3d 466, 480 (6th Cir. 2014) (falsely claiming they had spoken with one of the victims). While "[e]xtreme forms of deception or chicanery by the

---

[4] Loonsfoot argues that SA Hoff lied about speaking with Loonsfoot's wife to make it seem as if he had details regarding the sexual assault that he actually did not have. SA Hoff received details about the sexual assault from the victim. He lied about receiving information from Loonsfoot's wife because he did not want Loonsfoot to know that the information had come from his granddaughter, in order to protect the victim.

police may be sufficient to render a confession involuntary . . . 'the use of chicanery does not automatically undermine the voluntariness of a confession.'" *United States v. Jacques*, 744 F.3d 804, 812 (1st Cir. 2014) (citation omitted) (rejecting claim that FBI agent overbore defendant's will through use of the Reid technique). Here, Hoff told Loonsfoot that he had learned of the alleged sexual misconduct from Loonsfoot's wife. This false statement does not rise to the level of extreme deception or chicanery. In addition, Loonsfoot appeared to dispute this claim. (Recording at 25:03.) Thus, this deception by the officers does not constitute coercion.

Loonsfoot also asserts that the officers repeatedly insisted he had engaged in sexual misconduct with the victim despite Loonsfoot's denials. From the undersigned's perspective, this part of the interview comes the closest to being coercive. But, Loonsfoot did not seem to capitulate in the face of these accusations. The statements by the officers seemed to indicate that they believed Loonsfoot engaged in sexual misconduct with the victim for many years. Although the officers told Loonsfoot that they knew he had engaged in sexual misconduct with her, the officers did not specify what they meant. As mentioned previously, in general, Loonsfoot's statements evolved over the course of the interview from clear denials to some ambiguous acknowledgement of wrongdoing potentially tied to his consumption of alcohol. But, he never explicitly admitted a long-running sexual relationship with the victim. In the end, Loonsfoot offered a limited admission to an act of sexual misconduct that was not charged in the indictment.

Loonsfoot's apparent resistance to the tactics employed by the officers leads to the second and third factors – whether the coercion was sufficient to overbear the defendant's will (the second factor) and whether the alleged police misconduct was the crucial motivating factor in the defendant's decision to offer the statement (the third factor). These factors do not favor the conclusion that Loonsfoot's responses were coerced.

At the hearing, defense counsel argued that Loonsfoot believed that he was not free to leave and that he was under pressure from SA Hoff and Sgt. Goodreau to admit guilt. Loonsfoot, however, did not provide testimony on this point. Thus, the Court has no direct evidence that the alleged police misconduct was the "crucial motivating factor", *Mahan*, 190 F.3d at 422, in the defendant's decision to offer the statement. In addition, neither Hoff's testimony nor Loonsfoot's statements in the recording indicate that Loonsfoot's will was overborne or that police misconduct was the crucial motivating factor in obtaining a confession. Obviously, the Court cannot speculate as to what Loonsfoot believed at the time of the interview. But the recording of the interview contains multiple denials of unlawful sexual conduct by Loonsfoot. Loonsfoot even said he was "pissed off" or mad about being blamed for something. (Recording at 22:00.) Viewing the totality of the evidence before the Court, the undersigned cannot conclude that misconduct by the officers was "the crucial motivating factor in the defendant's decision to offer the statement."

Counsel for Defendant also offers argument about Loonsfoot's susceptibility to pressure and coercion. But, as noted above, the record contains no evidence

regarding Defendant's maturity level, susceptibility to police pressure, education, physical condition, and mental health status – other than, perhaps, personal information on Mr. Loonsfoot contained in the pretrial services report. (ECF No. 4.)

In summary, the undersigned concludes that the record does not show (1) that the police activity was objectively coercive, (2) that the coercion in question was sufficient to overbear the Loonsfoot's will, or (iii) the alleged police misconduct was the crucial motivating factor in the defendant's decision to offer the statement.

### IV. Recommendation

It is respectfully recommended that the Court deny Loonsfoot's motion to suppress his statements during the January 24, 2019, interview and find that the government has met it burden of proving that the statements made by Loonsfoot on January 24, 2019, were voluntary and not coerced.

Dated:   August 16, 2021                    /s/ *Maarten Vermaat*
                                            MAARTEN VERMAAT
                                            U.S. MAGISTRATE JUDGE

NOTICE TO PARTIES:   Objections to this Report and Recommendation must be served on opposing parties and filed with the Clerk of the Court within fourteen (14) days of receipt of this Report and Recommendation.  28 U.S.C. § 636(b)(1)(C); Fed. R. Civ. P. 72(b); W.D. Mich. LCivR 72.3(b).  Failure to file timely objections constitutes a waiver of any further right to appeal.  *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  *See also Thomas v. Arn*, 474 U.S. 140 (1985).